ORIENTAL TISSUE CO. v. LOUIS DEJONGE & CO.

(Circuit Court of Appeals, Second Circuit.  November 10, 1914.)

No. 33.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—THIN LEAF OR FABRIC.

The Gregory patent, No. 848,301, claim 2, for a thin leaf or fabric composed entirely of soluble cotton and a coloring matter incorporated therein, intended to be used for decorative purposes instead of metal leaf, *held* valid and infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Oriental Tissue Company against Louis Dejonge & Co.  Decree for complainant, and defendants appeal.  Affirmed.

. The following is the opinion of Mayer, District Judge, in the lower court:

The patent is for an imitation metal leaf which can be used as a substitute for gold leaf, silver leaf, and the like.  The patentee states: "My invention consists in providing a thin leaf or fabric which is made to imitate metal leaf—such, for instance, as gold leaf, silver leaf, and the like—which thin leaf or fabric is suitable for use in embossing and decorative. purposes generally; it being extremely tenacious and capable of being more easily handled than the gold or other metal leaf itself."

In making this leaf, the patentee dissolves soluble cotton in a suitable solvent, such as amyl acetate (amyl oil the patentee calls it); to this solution he adds an appropriate amount of some metallic coloring matter, such as gold bronze, and then he flows this mixture, which is lighter than water, upon some suitable surface, such as water.  The mixture spreads out in a thin sheet on the water surface, and the solvent, amyl acetate, evaporates or volatilizes, thereby leaving a very thin leaf or fabric, which consists of the soluble cotton with the small metallic flakes or bronze incorporated therein; the sheet resembling very closely real gold leaf.  The sheet is only about one four-thousandth of an inch thick.

This suit is brought upon the article itself, and not upon the method of making the leaf.  The claim reads:

"2. A thin leaf or fabric composed entirely of soluble cotton and a coloring matter incorporated therein."

In addition to the defenses of anticipation, noninvention, and noninfringement, the defendant has set up in its answer the statutory defense that Gregory surreptitiously or unjustly obtained a patent for that which in fact was invented by one Healy.  Much testimony has been taken on this question of prior invention by Healy.  To analyze this testimony in detail would involve practically an extended outline of the record and a summary of the briefs in regard to this subject.

The defendant has not sustained the burden cast upon it in respect of Healy's claim, and there is enough question as to accuracy of dates and enough controversy as to various details to suggest serious doubt as to Healy's claim of prior invention; but in any event the testimony of Edward C. Seward disposes of the matter.  Mr. Seward is an experienced member of the bar of long standing and represented the interests which were associated with Gregory and which intended to promote his invention.  On January 31, 1906, Gregory filed an application for patent on the leaf and on the method for making it.  The Patent Office required that this subject-matter be separated into two patents, one on the method and the other on the article itself, and accordingly a short time thereafter, and while the original application was still

pending, Gregory filed an application for a patent on the article itself which matured into the patent in suit. These applications and the inventions embodied therein were assigned by Gregory to one Walter A. Ker, the New York manager of a large bookbinding concern and by Ker to complainant.

While Gregory's original application for patent was pending, and in May, 1906, Gregory's attorneys, Messrs. Brown & Seward, of No. 261 Broadway, New York City, received word from the Patent Office that an interference was about to be declared between Gregory's application and the application of another party. Gregory suspected that Healy might be the party who had filed the other application, and he interviewed Healy on June 6, 1906. Healy decided that he would join with Gregory and Ker, and on June 11th an agreement was drawn up whereby Ker, Gregory, Healy, and two other men were to form a corporation for the manufacture of the leaf in accordance with the Gregory patents, each one of the parties to have an equal number of shares of stock. Healy was apparently satisfied with the arrangement and signed the agreement. It became necessary to straighten out the situation in the Patent Office, and in conformity with the understanding between the parties regarding the settlement of the interference Healy signed an abandonment of his invention on June 20, 1906, and this paper was sent to the Patent Office. Owing to some informality in the abandonment, the Patent Office refused to give the paper effect and a few days later Healy and Gregory went to the office of Messrs. Brown & Seward, in order to explain to them the condition of affairs so that the interference could be properly settled.

Mr. Seward carefully explained to them the necessity of determining who was the real inventor. I am entirely satisfied that Mr. Seward made the situation clear to Healy, pointing out the importance and necessity of these two men determining who the real inventor was. Mr. Seward prepared an abandonment for Healy to sign, and advised that the two men "should not use undue haste if there was any question about who the real inventor was, but should take the matter deliberately. They said they would do so and took the abandonment that I [Seward] had prepared away with them without signing." This abandonment was signed by Healy on June 25th and forwarded to the Patent Office; this now being the second abandonment to Gregory which Healy had signed.

Messrs. Brown & Seward heard a few days later that the abandonment had not been received by the Patent Office, and accordingly on June 30th Healy saw Mr. Seward again and signed a third abandonment. Before this third abandonment was filed, information came that the second abandonment had been received and accepted by the Patent Office.

The record shows that Mr. Seward took every precaution which a careful lawyer could take. The matter was not hastily disposed of, and it must be remembered that at this time it was a matter of indifference to Mr. Seward, as representing the interests intending to promote the invention, as to who was the inventor. It was a matter, however, of vital importance that the letters patent should issue to the true inventor. I am not only satisfied that Gregory must be regarded as the inventor, but that any other conclusion would be gravely inequitable. As Judge Coxe said in United Shirt & Collar Co. v. Beattie, 149 Fed. at page 741, 79 C. C. A. at page 447: "The question is at best a technical abstraction. No rights of rival inventors are involved. * * * A decision against Pine [here Gregory] now will benefit infringers, but will be no benefit to Dormandy [here Healy]."

The complainant in this suit has made its investments upon the faith of Healy's conduct, as well as Gregory's, and at this late date a court of equity will not be seen to destroy or impair the rights of complainant under the circumstances disclosed in this record.

The defendant introduced in evidence ten patents, only two of which need be referred to specifically. The remaining eight patents seem to me to be in remote or nonanalogous arts, and, in any event, do not make any disclosure which can be regarded as anticipating or as negativing invention by Gregory.

The Oeser patent (No. 660,024, October 16, 1900) was for a process for the manufacture of colored or similar films such as are used for the coloring of paper, leather, and the like. The inventor pointed out that great difficulty

had been experienced from the disintegration or crumbling of the film after it had been attached to the surface of the fabric, with the result that the film gave off its color and soiled the surrounding fabric to which it had been fixed. "My invention," said Oeser, "is intended to obviate this difficulty, inasmuch as the color or ·bronze film manufactured by my improved process will not give off its color. It is also possible by this process to obtain shaded or differently colored foils, such as may be used in imitation of the appearance of marble, wood, and the like."

The product claim (No. 3) in this patent was for "a new article of manufacture, a film consisting of isinglass, glycerin, albumen, and a color." There is certainly nothing in the claim or in the patentee's description to suggest a composition of soluble cotton and a color.

A British patent to one Herman Ernst was granted September 23, 1893. It was for a "process for .obtaining color leaf which can be employed in the same way as, for instance, metal or gold leaf for blocking on cardboard, etc., which is performed by pouring a mixture of 70 to 75 per cent. of collodium (of 2 per cent.) solution and oil color (25 to 30 per cent.) on a polished surface and loosening the formed thin leaves when perfectly dry." The claim was for "process for obtaining color leaf for blocking."

It seems strange, if the Ernst patent was so clear and informing as to anticipate or negative invention by Gregory, that no one made imitation metal leaf from 1893 down to Gregory's time. In the first place, an inspection of the leaves in evidence made by defendant's expert seems to indicate that the Ernst patent, even under the most favorable experimental manufacture in pursuance thereof, produces a result far removed from the actual result of the disclosure in the patent in suit. Secondly, the use of an oil color negatives a leaf having any metallic lustre, and consequently negatives the production of an imitation metal leaf. While this patent sets forth a process for making a color leaf, which can be used for blocking purposes, it certainly negatives the production of an imitation metal leaf.

The truth is that the Gregory invention was to all intents and purposes a pioneer. It is highly meritorious, and because of its merit, aided doubtless by necessary capital and good business methods, a new industry has been created, which the courts should be disposed to protect as against a too fine construction of the prior art.

The most serious question is that of infringement. There is a sharp dispute as to the meaning of the claim; but the claim is stated in simple language, and in connection with the context I think its interpretation is plain. "Coloring matter" means, of course, that coloring matter which will produce the imitation leaf desired. "Entirely" means the absence of any ingredient which is foreign either to soluble cotton or the appropriate coloring matter.

I am satisfied that defendant's leaves have some adhesive matter on one side, the purpose of which is to cause them to adhere to books and other articles by an embossing process. Professor Carmichael testified that there are certain substances in commercial soluble cotton bought in the regular course of trade. He said: "I have found naphtha, mineral oil, and castor oil, among the liquid substances, and gums and resins, with the properties of gum sandrac, gum mastic, and common resin, among the solids." This same expert (whose testimony is impressive) analyzed defendant's leaves (X-Q. 183) and testified to finding gum mastic only to the extent of a fraction of 1 per cent.

The defendant insists that its leaf contains a small percentage of glycerin and about 25 per cent. of gum mastic. It is contended by complainant that defendant's expert purposely omits in his per cent. statement the fact that the soluble cotton is itself only 12½ per cent. of the leaf, in order to make the percentage of adhesive seem very large, and complainant claims that, when the percentage of adhesive to the total leaf is figured, it would be found that the adhesive is only between 3 and 4 per cent. of the leaf as a whole.

In this not unusual battle of experts, it is significant and persuasive that the leaves of complainant and defendant handed to defendant's expert were not analyzed, or, in any event, that defendant did not offer any testimony as to the actual constituents of those leaves manufactured by the parties to the suit. Without further elaboration, I may say that I am convinced that

the defendant has infringed. Even the addition of gum mastic for adhesive purposes would not, under settled authority, relieve against infringement. Complainant may have the customary decree.

Seward Davis, of New York City, for appellants.

E. C. Seward, of New York City, for appellee.

Before COXE, WARD, and ROGERS, Circuit Judges.

PER CURIAM. This is an appeal from a decree of the District Court holding United States letters patent No. 848,301 for a thin leaf or fabric valid and infringed. The patent is on the article and not on the method of making it. Only the second claim is involved, as follows:

"2. A thin leaf or fabric composed entirely of soluble cotton and a coloring matter incorporated therein."

The patentee describes his invention in the specification as follows:

"My invention consists in providing a thin leaf or fabric which is made to imitate metal leaf—such, for instance as gold leaf, silver leaf and the like—which thin leaf or fabric is suitable for use in embossing and decorative purposes generally, it being extremely tenacious and capable of being more easily handled than the gold or other metal leaf itself."

We have but little to add to the opinion of the District Judge. The defendant insists that claim 2 is invalid because it is so broad as to include patents which Judge Mayer did not specifically consider in his opinion, among others British patents to Berard, No. 1,884 of 1857, to Abel, No. 9,962 of 1904, and United States patent No. 600,824 of 1898, to Stevens & Lefferts. These patents do disclose the making of thin sheets or films by dissolving soluble cotton in a suitable solvent which subsequently evaporates and adding coloring matter. Claim 2 taken literally would cover products made by these earlier patents and so construed would be invalid as too broad. It is, however, to be construed in connection with the specifications and with what the patentee describes to be and what we find actually was his invention, viz., a thin metallic leaf, an article which is not shown to have been anticipated.

Decree affirmed.